USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/16/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

OPPENHEIMER & CO. INC.,                :    09 Civ. 8154 (LAP)

    Petitioner,                        :    OPINION AND ORDER

    v.                                 :

DEUTSCHE BANK AG,                      :

    Respondent,                        :

US AIRWAYS, INC.,                      :

    Respondent-Intervenor,             :

and                                    :

FINRA DISPUTE RESOLUTION, INC.,        :

    Nominal Third-Party Relief
    Respondent.                        :

- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief U.S. District Judge

    On December 15, 2009, the parties in the above captioned matter convened before me for argument on an application by Oppenheimer & Co., Inc. ("Oppenheimer") for a stay of arbitration proceedings currently pending before the Financial Industry Regulatory Authority ("FINRA").  At the conclusion of the hearing I denied Oppenheimer's request for a stay.  This written opinion and order sets out the reasons for that denial.

1

## I.     Background

Oppenheimer's request for a stay of arbitration arises out of the collapse of the auction rate securities ("ARS") market in early 2008. US Airways, Inc. ("US Airways") had previously purchased ARS through Oppenheimer, a securities broker-dealer. These ARS were allegedly "created, issued, marketed and sold by Deutsche Bank AG ["DBAG"] through one of its subsidiaries or affiliates," namely Deutsche Bank Securities, Inc. ("DBSI"). (Mem. of Law in Supp. of Pet. to Compel Arbitration and for Stay of Arbitration Pending Final Resolution of the Pet. to Compel 1.) The market collapse rendered ARS illiquid, and US Airways alleges that it remains unable to sell its ARS holdings. (See id.) US Airways commenced arbitration proceedings against Oppenheimer before FINRA in February 2009, claiming that Oppenheimer purchased ARS for US Airways in violation of the parties' agreed-upon Investment Policy and Objectives. (See Statement of Claim, US Airways Inc. v. Oppenheimer & Co. Inc., and Vincent Woo, FINRA Arbitration No. 09-00878 (attached as Ex. 1 to Decl. of Marvin G. Pickholz In Supp. of Pet. to Compel Arbitration and for Stay of Arbitration Until the Final Resolution of the Pet. to Compel).) Oppenheimer filed an Answer in the FINRA proceedings on July 10, 2009, along with a third-party statement of claim against DBAG and DBSI for their role in the issuance and sale of the ARS. (Id. Ex. 2, 3.) DBSI is a

FINRA member and is therefore obligated to arbitrate Oppenheimer's claims; DBAG is not a member and has refused to participate in the FINRA proceedings. Oppenheimer's petition before this Court thus seeks to compel DBAG to participate in the arbitration. (See Petition to Compel Arbitration and for a Stay of the Arbitration.)

US Airways was permitted to intervene in the underlying action pursuant to a Stipulation and Order dated November 20, 2009. On December 3, 2009, Oppenheimer sought and obtained an Order to Show Cause from District Judge Sidney H. Stein, sitting in Part 1. The Order to Show Cause set out a briefing schedule and directed the parties to convene before this Court on December 15, 2009, to discuss the issues surrounding Oppenheimer's request for an order enjoining the parties from participating in the FINRA arbitration pending resolution of Oppenheimer's petition to compel DBAG to arbitrate. (Order to Show Cause 2.) Opposition papers were due December 11, 2009, and reply papers were due December 14, 2009. DBAG did not submit papers and took no position on Oppenheimer's request. FINRA Dispute Resolution, Inc. likewise took a neutral stance and stated that it would abide by the Court's decision.

Oppenheimer and US Airways, the only parties who argued the instant dispute on December 15, disagreed over the nature of Oppenheimer's request and the standards that should govern the

3

Court's analysis of the issues.  US Airways, noting that Oppenheimer had originally framed the Order to Show Cause as an "application for a temporary restraining order and a preliminary injunction," (Decl. of Suzan Jo in Supp. of Oppenheimer & Co. Inc.'s Order to Show Cause ¶ 6), argued that the standards for issuing a preliminary injunction should apply.  Oppenheimer countered in its reply memorandum of law that the request for a stay of arbitration was "in the nature of an application under the All Writs Act, 28 U.S.C. § 1651." (Reply Mem. of Law in Further Supp. of Pet. for Stay of Arbitration 1.)  Whether viewed as a request under the All Writs Act or as a request for a preliminary injunction, Oppenheimer's application to stay the arbitration is denied.

**II. Discussion**

    **A.  Power to Stay the Arbitration Under the FAA and the All Writs Act**

US Airways made the preliminary argument in its briefing on Oppenheimer's petition to compel arbitration that this Court did not have the power to stay the instant arbitration under the Federal Arbitration Act ("FAA"). (See US Airways' Mem. of Law 10-12.)  While I will assume without deciding that the Court does have the power to stay arbitration in the instant case, a brief discussion of the issues surrounding US Airways' argument is appropriate.

4

### 1. Power to Stay Arbitration Under the FAA

The Court of Appeals has yet to state expressly whether a district court has the power to stay arbitration proceedings. See Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 266 (2d Cir. 1996), abrogated on other grounds, Vaden v. Discover Bank, 129 S.Ct. 1262 (2009) ("Because we find that subject matter jurisdiction is lacking, we do not need to decide whether the [Federal Arbitration Act ("FAA")] gives federal courts the power to stay arbitration proceedings."). "While § 3 of the FAA gives federal courts the power to stay trials pending arbitration, [] a number of courts have held that, in appropriate circumstances, § 4 of the FAA may be applied to stay or enjoin arbitration proceedings." Id.; see Satcom Intern. Group PLC v. Orbcomm Intern. Partners, L.P., 49 F. Supp. 2d 331, 342 (S.D.N.Y. 1999) (adopting Westmoreland's logic and staying arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards). Despite the lack of a clear rule, the Court of Appeals "has affirmed district court decisions staying or enjoining arbitration proceedings without finding it necessary to articulate its basis for doing so." In re Insurance Co. of North America, No. 08CV7003 (HB), 2008 WL 5205970, at *3 (S.D.N.Y. Dec. 12, 2008), vacated, In re Petition of Insurance Co. of North America v. Public Service Mut. Ins. Co., No. 08CV7003(HB), 2009 WL 2381854 (S.D.N.Y. Jul. 29, 2009) (quoting

Maronian v. American Communications Network, No. 07-CV-6314 (CJS), 2008 WL 141753, at *8 (W.D.N.Y. Jan. 14, 2008)).

Several courts have used Westmoreland's "appropriate circumstances" language as guidance in granting stays of arbitration. For example, courts in this district have stayed arbitrations "in those circumstances where a stay would be incidental to the court's power under the FAA to enforce contractual agreements calling for arbitration." United States v. Eberhard, No. 03 Cr. 562 (RWS), 2004 WL 616122, at *3 (S.D.N.Y. Mar. 30, 2004) (declining to stay arbitration because petitioner "made no claims regarding the applicability or scope of the arbitration agreement"); see L.F. Rothschild & Co., Inc. v. Katz, 702 F. Supp. 464, 468 (S.D.N.Y. 1988) (enjoining defendants from proceeding with an arbitration where it was not authorized by contract). At least one court has also stayed arbitration proceedings as necessary to implement the "general rule" that arbitration proceedings start anew following the death of an arbitrator. See In re Insurance Co. of North America, 2008 WL 5205970, at *3.

US Airways cites one case that holds that courts do not have the power to stay arbitration under the FAA. In Ghassabian v. Hematian, No. 08 Civ. 4400 (SAS), 2008 WL 3982885, at *2 (S.D.N.Y. Aug. 27, 2008), the court noted that:

6

> Power is expressly conferred on the federal courts to compel arbitration, to appoint arbitrators, or to confirm an arbitration award. Given this enumerated list of judicial powers, according to the canon of statutory interpretation <u>expressio unius est exclusio alterius</u> ("the express mention of one thing excludes all others") it is unreasonable to infer the existence of further remedies.

As highlighted by the cases previously mentioned, the position taken by the court in <u>Ghassabian</u> appears to be an outlier. For the purposes of this Order to Show Cause, however, I assume without deciding that the Court has the power to stay arbitration in "appropriate circumstances."

### 2. Power to Stay Under the All Writs Act

Oppenheimer argued at the December 15 hearing that its request for a stay was in the nature of an application under the All Writs Act. The statute provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The All Writs Act allows a court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." <u>United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO</u>, 911 F. Supp. 743, 752 (S.D.N.Y. 1996) (quoting <u>United</u>

7

States v. New York Telephone Co., 434 U.S. 159, 172 (1977)). "An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction." Id. (quoting In re Baldwin-United Corp., 770 F.2d 328, 338 (2d Cir. 1985)). A court's authority under the All Writs Act is not unlimited, however. "[C]ourts cannot use the All Writs Act to justify the use of injunctions or commands where a statute specifically addresses the particular issue in dispute." Stevenson v. Tyco International (US) Inc. Supplemental Executive Retirement Plan, No. 04-CV-4037 (KMK), 2006 WL 2827635, at *9 (S.D.N.Y. Sept. 29, 2006) (citing Penn. Bureau of Corr. v. United States Marshals Serv., 474 U.S. 34, 43 (1985)). Likewise, the All Writs Act does not confer jurisdiction where jurisdiction is otherwise lacking. See id.

Oppenheimer fails to cite any cases where a court stayed arbitration proceedings pursuant to the All Writs Act. "It is clear . . . that a court may use the All Writs Act to prevent arbitrators from deciding issues within the court's jurisdiction. However, the FAA divests the courts of jurisdiction where the parties properly request arbitration." Id.

8

The pending FINRA arbitration does not interfere with this Court's jurisdiction, and Oppenheimer's request for a stay is therefore denied. See Eberhard, 2004 WL 616122, at *3 ("If this Court does not choose to exercise [the power to stay an arbitration under the All Writs Act] here, it is not for lack of such power but because the NASD arbitrations have not been shown to interfere with the Court's jurisdiction.") A stay is not needed to prevent frustration of a previous order from this Court. Nor will allowing the arbitration to go forward prevent this Court from later compelling DBAG to participate (if such a decision is in fact correct, which is far from clear). Moreover, a FINRA arbitration panel has not even been selected; no one at FINRA has attempted to decide a matter that would be in this Court's exclusive jurisdiction. In sum, staying the arbitration is not "needed to preserve the court's ability to reach or enforce" Oppenheimer's petition to compel DBAG to arbitrate. International Brotherhood of Teamsters, 911 F. Supp. at 752.

### B. Enjoining Arbitration Proceedings

While Oppenheimer's request for a stay under the All Writs Act is denied, the request is also denied if interpreted, as US Airways did, as an application for a preliminary injunction. "A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the

9

merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002). Oppenheimer has not satisfied this test.

### 1. Irreparable Harm

"The showing of irreparable harm is [p]erhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." Id. (internal quotation marks omitted). "To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" Id. (quoting New York Pathological & X-Ray Labs., Inc. v. INS, 523 F.2d 79, 81 (2d Cir. 1975)). "And, irreparable harm must be shown to be actual and imminent, not remote or speculative." Id.

Oppenheimer claims that allowing the arbitration to proceed (1) will require it to select arbitrators before this Court has determined whether DBAG should be compelled to arbitrate and (2) will deny Oppenheimer the ability to seek discovery from DBAG at the same time as it seeks discovery from the other parties to

the arbitration. Neither ground provides a basis for issuing a preliminary injunction staying the arbitration.

This is not a situation where a party "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003). Rather, Oppenheimer is arguing that it might not be able to conduct the arbitration on its preferred schedule and might have to spend more resources conducting duplicative discovery, revisiting rulings, or re-selecting an arbitration panel. As the Court of Appeals has noted, however, even "substantial" injuries "in terms of money, time and energy necessarily expended in the absence of a stay" are not considered "irreparable." Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995).

A determination that Oppenheimer has not established irreparable harm is bolstered by fact that the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement." Moses H. Cone Me. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 (1983). As US Airways notes, Oppenheimer's problem could be resolved by pursuing its claims against DBAG in a different venue—a situation contemplated by Congress in enacting the FAA.

### 2. Likelihood of Success on the Merits

A movant who "seeks a 'mandatory' injunction—[i.e.,] an injunction that will alter rather than maintain the status quo—[] must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008). Oppenheimer must therefore show that it is substantially likely to succeed (1) in compelling DBAG to arbitrate and (2) in staying the arbitration pending this Court's resolution of whether DBAG should be compelled to arbitrate. Oppenheimer has not demonstrated that it is substantially likely to succeed in either.

### i. Petition to Compel Arbitration

A court may enforce an arbitration agreement against a nonsignatory under five theories: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 780 (2d Cir. 1995)). Oppenheimer argues that DBAG should be compelled to arbitrate under the fourth and fifth theories.

### a. Estoppel

A company may be estopped from avoiding arbitration where the company "'knowingly accepted the benefits' of an agreement

12

with an arbitration clause." MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001) (quoting Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)). "The benefits must be direct-which is to say, flowing directly from the agreement." Id.

In Deloitte Noraudit A/S, for example, a foreign accounting firm entered into a settlement agreement concerning the use of the trade name "Deloitte." The agreement, which contained an arbitration clause, allowed local affiliates of the accounting association Deloitte Haskins & Sells International to use the trade name "Deloitte" in exchange for adherence to the dictates of the agreement. A Norwegian accounting firm used the Deloitte trade name after accepting the agreement and making no objections to its terms. When the Norweigian firm later argued that it could not be bound by the arbitration clause contained in the settlement agreement, the Court of Appeals held that the accounting firm was estopped from avoiding arbitration. Even though the firm did not sign the agreement, it accepted it and directly benefitted from the agreement's terms by using the name "Deloitte." See Deloitte Noraudit A/S, 9 F.3d at 1064.

Oppenheimer has not demonstrated that it is substantially likely to establish that DBAG realized a similarly direct

benefit from DBSI's FINRA membership.[1] While Oppenheimer alleges that DBAG gained financially from DBSI's actions as a broker-dealer, it has not alleged that DBAG itself operated as a broker-dealer under DBSI's FINRA membership. Benefits are not considered "direct" when a third party exploits the contractual relationship of two parties to an agreement. See MAG Portfolio Consultant, 268 F.3d at 61. DBAG has plausibly argued that it benefitted as a result of DBSI's contractual relationship with Oppenheimer, not by exploiting DBSI's FINRA membership itself. (See Mem. of Law of Resp't Deutsche Bank AG in Opp'n to Claimant's Pet. to Compel Arbitration 6-8.) Oppenheimer has therefore not shown that it is substantially likely to succeed on this point.

### b. Piercing the Veil/Alter-ego

Oppenheimer also argues that DBAG should be compelled to arbitrate because DBSI is the alter-ego of DBAG. "[A] parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 778 (2d Cir. 1995). Generally, "piercing the corporate veil requires a showing that: (1) the owners

---

[1] Because Oppenheimer did not brief the instant dispute as a request for a preliminary injunction, this section refers to Oppenheimer's arguments made at the December 15 argument and to the memorandum of law filed in support of Oppenheimer's petition to compel arbitration.

14

exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. New York State Dept. of Taxation and Finance, 82 N.Y.2d 135, 141 (1993).

Oppenheimer has alleged that DBAG exercised control over DBSI and directed its finances, policies, and management; that both were under common ownership; that DBSI was a virtual holding company; that there was an overlap in employees; and that both had the same address and phone number. (See Mem. of Law in Support of Petition to Compel Arbitration and for Stay of Arbitration Pending Final Resolution of the Petition to Compel 13-16.) Oppenheimer has not alleged that DBSI was undercapitalized, that DBSI did not observe corporate formalities, or that DBAG made improper use of DBSI's funds, elements that are normally needed to pierce the corporate veil. See American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988). Oppenheimer has therefore not established that it is substantially likely to succeed on this point.

### ii. Stay of Arbitration

Oppenheimer has not shown a substantial likelihood of success on its petition to stay arbitration pending this Court's decision on the merits of its petition to compel DBAG to arbitrate.

The two cases that Oppenheimer cites in its memorandum of law in support of its petition are distinguishable from the instant case. In Republic of Ecuador v. Chevrontexaco Corp., 376 F. Supp. 2d 334, 351, 378 (S.D.N.Y. 2005), for example, the Republic of Ecuador and its state-owned oil company Petroecuador sought a permanent stay of an arbitration proceeding commenced by ChevronTexaco and Texaco Petroleum Company. Id. at 343. The defendants argued that Petroecaudor should be estopped from denying that it had agreed to arbitrate the claims at issue, even though Petroecuador was not a signatory to the 1965 contract containing the arbitration agreement, because Petroecuador had accepted the benefits of the contract and had acted as if the contract controlled its relations with the parties. See id. at 351-52. The court stayed arbitration pending resolution of the factual issues surrounding Chevrontexaco's estoppel argument. See id. at 378.

Republic of Ecuador relied upon Bensadoun v. Jobe-Riat, 316 F.3d 171 (2d Cir. 2003), to support staying arbitration. In Bensadoun, the Court of Appeals remanded a case to the district court with instructions to stay arbitration pending resolution of the factual issue of whether certain investors qualified as customers of the plaintiff. See 316 F.3d at 177-78. As in Republic of Ecuador, resolution of the factual issue was necessary to determine whether the underlying claims were

16

arbitrable. See id. at 178; Republic of Ecuador, 376 F. Supp. 2d at 378.

Oppenheimer correctly notes that whether a party agreed to arbitrate falls into the more general inquiry into "arbitrability." See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Intern., Inc., 198 F.3d 88, 95 (2d Cir. 1999) ("In considering whether 'a particular dispute is arbitrable,' a court must first decide "whether the parties agreed to arbitrate. . . . We have held that whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate.") (quoting Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999)).  In this sense, whether DBAG agreed to arbitrate the instant dispute—under either an estoppel theory or as DBSI's alter-ego—is an issue of arbitrability.

Unlike the arbitrability disputes in Bensadoun and Republic of Ecaudor, however, resolution of the instant arbitrability question in DBAG's favor would not nullify the underlying arbitration proceeding.  Because the parties agree that Oppenheimer, US Airways, and DBSI must arbitrate the dispute before FINRA, there is no concern here with wasting time and resources in an arbitration that might eventually be declared

17

void.  Oppenheimer has therefore failed to demonstrate that it is substantially likely to succeed on this issue.

**Conclusion**

In sum, whether treated as an application under the All Writs Act or an application for a preliminary injunction, Oppenheimer's request for a stay of arbitration pending resolution of the petition to compel arbitration is denied.

SO ORDERED:

DATED:   New York, New York
         December ___, 2009

                                    _____
                                    LORETTA A. PRESKA, Chief U.S.D.J.

**Conclusion**

In sum, whether treated as an application under the All Writs Act or an application for a preliminary injunction, Oppenheimer's request for a stay of arbitration pending resolution of the petition to compel arbitration is denied.

SO ORDERED:

DATED:   New York, New York
         December 16, 2009

_____
LORETTA A. PRESKA, Chief U.S.D.J.