```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
OPPENHEIMER & CO. INC.,             :    09 Civ. 8154 (LAP)
                                    :
        Petitioner,                 :    Memorandum and Order
                                    :
        v.                          :
                                    :
DEUTSCHE BANK AG,                   :
                                    :
        Respondent.                 :
                                    :
- - - - - - - - - - - - - - - - - -x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/2/10

LORETTA A. PRESKA, Chief U.S. District Judge

　　　　Petitioner Oppenheimer & Co. Inc. ("Oppenheimer") brings this petition, pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, to compel Respondent Deutsche Bank AG ("DBAG") to arbitrate before the Financial Industry Regulatory Authority ("FINRA").  For the reasons set forth below, Oppenheimer's petition to compel arbitration is DENIED.

**A. Factual and Procedural Background**

　　　　Oppenheimer's petition arises out of the collapse of the auction rate securities ("ARS") market in early 2008.  US Airways, Inc. ("US Airways") purchased ARS through Oppenheimer, a securities broker-dealer.  DBAG allegedly "created, issued, marketed and sold" these ARS "through one of its subsidiaries or affiliates," namely Deutsche Bank Securities, Inc. ("DBSI").

(Mem. of Law in Supp. of Pet. to Compel Arbitration and for Stay of Arbitration Pending Final Resolution of the Pet. to Compel ("Petr.'s Br.") 1.)

US Airways commenced arbitration proceedings against Oppenheimer before FINRA in February 2009.  US Airways claimed that Oppenheimer had purchased the ARS in violation of the parties' agreed-upon Investment Policy and Objectives and that it had suffered damages because the ARS had become illiquid. (See Statement of Claim, US Airways Inc. v. Oppenheimer & Co. Inc., and Vincent Woo, FINRA Arbitration No. 09-00878 (attached as Ex. 1 to Decl. of Marvin G. Pickholz In Supp. of Pet. to Compel Arbitration and for Stay of Arbitration Until the Final Resolution of the Pet. to Compel ("Pickholz Decl.")).) Oppenheimer filed an Answer in the FINRA proceedings on July 10, 2009, along with a third-party statement of claim against DBAG and DBSI for their roles in the issuance and sale of the ARS. (Id. Ex. 2, 3.)  DBSI is a FINRA member and is therefore obligated to arbitrate Oppenheimer's claims; DBAG is not a member and has refused to participate in the FINRA proceedings. Oppenheimer's petition before this Court thus seeks to compel DBAG to participate in the arbitration.

On December 3, 2009, Oppenheimer obtained an order to show cause why the arbitration should not be stayed pending resolution of the petition to compel.  The parties convened

2

before the Court for argument on the application on December 15, 2009. At the conclusion of the hearing the Court denied Oppenheimer's request for a stay. In a subsequent written opinion the Court explained that Oppenheimer had failed to demonstrate a clear or substantial likelihood of success on the merits of its petition to compel arbitration. See Oppenheimer & Co. Inc. v. Deutsche Bank AG, No. 09 Civ. 8154 (LAP), 2009 WL 4884158, at *1 (S.D.N.Y. Dec. 16, 2009). For the reasons set forth below, the Court now concludes that Oppenheimer's petition to compel arbitration should be denied.

**B. Discussion**

FINRA Rule 13200 requires that "a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." Rule 13200(a). As a FINRA Member, DBSI is required to arbitrate with Oppenheimer. DBAG is not a FINRA member and cannot be compelled to arbitrate under Rule 13200.

"[A] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 97 (2d Cir. 1999). A signatory who wishes to enforce an arbitration agreement against a nonsignatory therefore must establish at least one of the following five

3

theories: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 780 (2d Cir. 1995)). These limited exceptions follow "ordinary principles of contract and agency" and serve to "protect parent companies" when subsidiaries enter into arbitration agreements; for this reason, "[a]nything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations." Merrill Lynch Inv. Managers, 337 F.3d at 130 (quoting Thomson-CSF, 64 F.3d at 780).

Oppenheimer argues that DBAG should be compelled to arbitrate under the estoppel and veil piercing/alter ego theories. Each is considered below.

**1. Estoppel**

A party may be estopped from avoiding arbitration where the party "'knowingly accepted the benefits' of an agreement with an arbitration clause." MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001) (quoting Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)). "The benefits must be direct—which is to say, flowing directly from the agreement." Id. The mere fact of a nonsignatority's affiliation with a signatory will not

4

suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is. See id. at 62.

In Deloitte Noraudit A/S, for example, Deloitte Haskins & Sells International ("DHSI"), an international association of accounting firms, entered into a settlement agreement on behalf of its members concerning the use of the trade name "Deloitte." The agreement, which contained an arbitration clause, allowed the local affiliates to use the trade name "Deloitte" in exchange for adherence to the dictates of the agreement.  A Norwegian affiliate continued using the Deloitte trade name after accepting the agreement and making no objections to its terms.  When the Norwegian firm later argued that it could not be bound by the arbitration clause contained in the agreement, the Court of Appeals held that the firm was estopped from avoiding arbitration.  Even though the firm did not sign the agreement, it accepted a copy of it and directly benefitted from the agreement's terms by continuing to use the name "Deloitte." See Deloitte Noraudit A/S, 9 F.3d at 1064.

Benefits are not "direct" when a third party exploits the contractual relationship of two parties to an agreement. See MAG Portfolio Consultant, 268 F.3d at 61.  In Thomson-CSF, for example, a company that built flight simulators entered into an agreement with a supplier of computer-generated imaging equipment in which the supplier agreed to sell its imaging

5

equipment only to the company. See 64 F.3d at 775. The agreement between the two entities contained an arbitration clause. See id. A competitor subsequently purchased the company and incorporated it into its own flight simulator division. See id. The supplier commenced arbitration proceedings against the competitor once it became clear that the competitor had purchased the company simply to keep it from competing and that the competitor never intended to purchase imaging equipment from the supplier. Id. at 779.

The Court of Appeals held that the competitor could not be forced to arbitrate. Id. The competitor had not benefitted directly from the agreement; rather, the competitor had benefitted directly from its purchase of the company and had simply taken advantage of the company's contractual relationship with the supplier. Had the competitor directly benefitted from the agreement "by seeking to purchase equipment from [the supplier] or enforcing the exclusivity provisions of the [a]greement," on the other hand, "it would [have been] estopped from avoiding arbitration." Id.

The court in Phoenix Companies, Inc. v. Abrahamsen, No. 05 Civ. 4894 (WHP), 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006), similarly declined to estop a nonsignatory from refusing to arbitrate. Phoenix Companies involved a group of entities companies that provided insurance and asset management products

6

and services. See id at *1. Phoenix Life Insurance Co. ("PLIC") was a wholly owned subsidiary of The Phoenix Companies, Inc. ("PNX"), a holding company. See id. W.S. Griffith Securities, Inc. ("Griffith") was an indirect subsidiary of PNX and a securities broker-dealer registered with the National Association of Securities Dealers ("NASD").[1] The defendants in the case were a group of financial advisors who contracted with PLIC to sell certain Phoenix financial products and with Griffith to sell registered Phoenix products. See id. The defendants' contracts with PNX did not require arbitration; as a NASD member, however, Griffith was required to arbitrate with the defendants. See id. at *4.

The defendants argued that PNX and PLIC were required to arbitrate under an estoppel theory because they had directly benefitted from the agreements between Griffith and the defendants. See id. at *7. The court disagreed and held that any benefits that these entities derived from the agreements were indirect. While PNX and PLIC benefitted from the sale of Phoenix products by Griffith's registered associates, PNX and PLIC "did not have any involvement in the execution or performance of the [agreement]" between Griffith and the defendants and were not even mentioned in the agreements. Id.

---

[1] In 2007, NASD was consolidated with certain regulatory bodies of the New York Stock Exchange to become FINRA.

The court therefore concluded that there was no evidence that PNX or PLIC had received direct benefits from the agreements and declined to compel them to arbitrate. See id.

The benefits that DBAG realized from DBSI's FINRA membership are more akin to the indirect benefits in Thomson-CFS and Phoenix Companies than the direct benefits in Deloitte Noraudit A/S. DBSI's FINRA membership allowed it to operate as a securities broker-dealer. While Oppenheimer alleges that DBAG gained financially from DBSI's activities as a FINRA member, it has not alleged that DBAG itself operated as a broker-dealer or that DBAG sought to enforce any particular provisions of DBSI's FINRA membership. Rather, as in Thomson-CFS and Phoenix Companies, DBAG benefitted as DBSI's parent by taking advantage of DBSI's broker-dealer relationships with its clients. (See Mem. of Law of Resp't Deutsche Bank AG in Opp'n to Claimant's Pet. to Compel Arbitration 6-8.) Oppenheimer's reliance on Noraudit A/S is similarly misplaced. Unlike the agreement in Noraudit A/S, which was entered into by an umbrella entity on behalf of all Deloitte member firms and which expressly sought to bind the members, there is no evidence that the terms of DBSI's FINRA membership expressly sought to bind DBAG. See 9 F.3d at 1061.

In sum, Oppenheimer has failed to establish that DBAG directly benefitted from DBSI's FINRA membership. The Court

therefore will not compel DBAG to arbitrate under an estoppel theory.

### 2. Piercing the Veil/Alter Ego

Oppenheimer also argues that the Court should compel DBAG to arbitrate because DBSI and DBAG are alter egos. "[A] parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." Thomson-CSF, 64 F.3d at 778. Under New York law, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. New York State Dept. of Taxation and Finance, 82 N.Y.2d 135, 141 (1993).

Whether an owner completely dominated a corporation is a fact specific inquiry. Courts have considered the following factors in determining whether to pierce the corporate veil:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds;
> (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's

9

> debts by the dominating entity, and (10) intermingling of property between the entities

MAG Portfolio Consultant, 268 F.3d at 63.

Oppenheimer alleges that DBAG exercised complete ownership and control over DBSI and directed its finances, policies, and management; that Taunus Corporation ("Taunus"), DBAG's subsidiary and DBSI's direct parent, was completely uncapitalized; that there was an overlap in personnel between DBAG and DBSI; and that both had the same address and telephone number. (See Petr.'s Br. 13-16.)  These allegations "are insufficient to establish the type of day-to-day control necessary to disregard corporate separateness." In re Ski Train Fire in Kaprun, Austria on November 11, 2000, 342 F. Supp. 2d 207, 216 (S.D.N.Y. 2004).

A parent corporation's complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil. De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 69 (2d Cir. 1996).  "Actual domination, rather than the opportunity to exercise control, must be shown." Id. (quoting Williams v. McAllister Bros. Inc., 534 F.2d 19, 21 (2d Cir. 1976)). Similarly, consolidated financial reports and overlapping directors and officers "are commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate

separateness." McAnaney v. Astoria Fin. Corp., 665 F. Supp. 2d 132, 144-45 (E.D.N.Y. 2009) (collecting cases). Contrary to Oppenheimer's argument, therefore, DBAG's admitted control over DBSI's financial and operational policies is consistent with an ordinary stockholder-corporation relationship and is not indicative of an alter ego relationship. The fact that DBAG's Management Board provided overall risk and capital management supervision for DBSI is similarly insufficient to give rise to alter ego liability. See Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc., No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *4 (S.D.N.Y. Mar. 25, 2009) ("Allegations of 'shared common ownership' and 'senior management responsibility' do not reach th[e] requisite threshold.").

Oppenheimer has not alleged that DBSI was undercapitalized. Oppenheimer's argument that Taunus was undercapitalized is off the mark. As an initial matter, the Deutsche Bank Annual Report cited by Oppenheimer notes that the Federal Reserve Board has approved Taunus's status as an undercapitalized entity because Taunus remains fully funded by its parent DBAG. (See Pickholz Decl. Ex. 7 at 50.) More importantly, the relevant question is not whether Taunus was undercapitalized but whether DBSI was undercapitalized. As a registered broker-dealer, DBSI is required to maintain minimum regulatory capital levels pursuant to the SEC's Uniform Net Capital Rule. (See Pickholz Decl.

11

Ex. 3D at 32.) Oppenheimer makes no allegations that DBSI has failed to comply with this requirement and presents no evidence that DBSI is undercapitalized. In fact, the KPMG Audit attached to Oppenheimer's petition notes that in 2008 DBSI exceeded its required minimum net capital by approximately $4.5 billion. (See Pickholz Decl. Ex. 3D at 32.)

Similarly, Oppenheimer presents no evidence that DBSI failed to observe corporate formalities or that DBAG made improper use of DBSI's funds—elements that, along with undercapitalization, are normally needed to pierce the corporate veil. See American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988). Oppenheimer does not allege, for example, that DBSI's board of directors did not hold regular meetings, that its officers did not act on the company's behalf, that DBSI failed to maintain proper accounts and records, or that DBAG improperly accessed DBSI's funds. The absence of these types of allegations, when considered alongside the other factors discussed above, is fatal to Oppenheimer's attempt to cast the two entities as alter egos. See In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) (declining to pierce the corporate veil where the plaintiffs presented "no allegations of the disregard of corporate formalities, inadequate capitalization, intermingling of funds or property, reduced discretion by any entity, failure to deal

12

at arms' length, or payment of the debts of one entity by another"); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 296-97 (S.D.N.Y. 2005) (declining to pierce the corporate veil where the plaintiff failed to allege "an intermingling of funds or a failure to adhere to corporate formalities" and stating that "[t]o hold otherwise would create an alter ego relationship between almost every parent and subsidiary"); In re Ski Train Fire in Kaprun, 342 F. Supp. 2d at 216 (declining to pierce the corporate veil where the plaintiffs "provided no evidence that [a subsidiary] failed to comply with corporate formalities, make its own day-to-day operational decisions, or remain sufficiently capitalized").

In sum, Oppenheimer has illustrated DBSI's role as DBAG's wholly owned subsidiary but has failed to establish that DBAG dominated DBSI to the extent necessary to give rise to alter ego liability. Oppenheimer has therefore failed to make the "full showing" necessary to compel DBAG to arbitrate under an alter ego theory. Merrill Lynch Inv. Managers, 337 F.3d at 130.

**Conclusion**

For the reasons set forth above, Oppenheimer's petition to compel arbitration [dkt. no. 1] is DENIED. Because the Court declines to compel DBAG to arbitrate, a stay of the arbitration

13

is unnecessary.  The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

DATED:     New York, New York
           March 2, 2010

                                           LORETTA A. PRESKA, Chief U.S.D.J.